UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIRK WAYNE LABADIE #219886,

        Plaintiff,               Case No. 2:14-cv-23

v.                                 HON. ROBERT HOLMES BELL

DOUGLAS MITCHELL, *et al.*,

        Defendants.
_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by state prisoner Kirk W. Labadie ("plaintiff") pursuant to 42 U.S.C. § 1983. On August 19, 2014, the Court dismissed plaintiff's complaint against defendants District Attorney Brian Peppler and Chippewa County for failing to state a claim upon which relief may be granted (docket #14). Currently before the court is the Motion for Summary Judgment filed by Defendants Fruchey, Mitchell, Pingatore, Touri, and Wagner (docket #26). In the motion, defendant Mitchell claims that plaintiff is unable to establish a valid Eighth Amendment excessive force claim. Defendants Fruchey, Wagner, Pingatore, and Touri claim that their actions do not amount to a valid "failure to intervene" claim. Plaintiff filed a response (docket #33) on March 6, 2015. Upon review, I recommend that defendants' motion for summary judgment be denied in part, and granted in part.

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for

determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

On August 19, 2012, an agitated prisoner, Kenneth Kammerse, clogged his toilet, causing flooding in the Behavioral Management Unit ("BMU") of the Chippewa County Jail. Defendant Mitchell started a dialogue with Kammerse and had almost pacified the prisoner when plaintiff, yelling from his cell, interjected into their conversation. Plaintiff claims that he was unaware that defendant Mitchell was talking to Kammerse, but the damage had been done, and Kammerse once again became irate. Defendant Mitchell, abandoning his attempts to placate Kammerse, then approached plaintiff. From here, it is unclear as to what exactly occurred.

Plaintiff offers a different version of events than defendants, and supplies no medical documentation or statements from witnesses to corroborate his testimony. Each defendant, on the other hand, has filed an affidavit with the Court, and defendants have submitted a DVD that shows their interaction with plaintiff. However, defendants' affidavits contradict one another, and assert fact patterns that are incompatible with what is shown on the DVD.

Plaintiff's version of events are as follows. Defendant Mitchell approached plaintiff's cell and told plaintiff to "Shut the fuck up and sit your ass down." Defendants Fruchey, Pingatore, and Touri were near plaintiff's cell at this time, and were observing plaintiff's interaction with defendant Mitchell. When plaintiff refused to sit down and remain silent, defendant Mitchell spat at him and again said "Shut the fuck up and sit down." Plaintiff refused to acquiesce, and defendant Mitchell sprayed him with Frost +P and laughed at plaintiff. Plaintiff then grabbed a bucket of water and threw it at defendant Mitchell. Defendant Mitchell then motioned as if he was going to spray plaintiff again, but before he could, plaintiff reached outside the bars and grabbed defendant Mitchell's shirt, temporarily preventing him from employing the Frost +P. When defendant Mitchell eventually escaped plaintiff's grasp, he sprayed plaintiff for a second time. Plaintiff responded by throwing a cup of lukewarm coffee onto defendant Mitchell, who then left for approximately five minutes.

When defendant Mitchell returned with a restraint chair, he told plaintiff to place his hands against the wall. Plaintiff replied, "Fuck off." Defendant Mitchell then employed a taser on plaintiff, as plaintiff was falling to the floor. Defendant Mitchell asked plaintiff how he liked being tased, and if he was done. Plaintiff said he was done, and was directed by defendant Mitchell to rise. When plaintiff attempted to get up, defendant Mitchell tased him again. Plaintiff was then allowed to get up off the floor and walk by himself to the restraint chair. No party contests that after the second tasing, plaintiff walked by himself to the restraint chair without incident. Plaintiff was then properly restrained and left in an observation cell for approximately two hours, where prison staff checked on him every fifteen minutes.

Defendant Mitchell states in his affidavit that he approached plaintiff's cell and told him to quiet down, as he was trying to pacify inmate Kammerse. Plaintiff responded with a profanity laced tirade, and after defendant Mitchell ordered him to sit down a second time, plaintiff asked "Who the fuck do you think you are?" When defendant Mitchell identified himself, plaintiff threatened defendant Mitchell with physical violence "numerous times," and stated that he would beat defendant Mitchell's "punk ass." (Docket# 26-2, 3). At this point, defendant Mitchell feared the situation was quickly building towards a riot in the BMU. Defendant Mitchell ordered plaintiff to sit down several times, but plaintiff continued to ignore defendant Mitchell's commands and continued to make threats. This altercation was inciting prisoners to become more vocal and upset.

Defendant Mitchell, after repeated unsuccessful attempts at quieting plaintiff, ordered plaintiff to place his hands on the back wall of the cell, so that jail staff could safely enter the cell and get control of him. Plaintiff again refused. Because the BMU houses violent and aggressive inmates, entering plaintiff's cell without first incapacitating him was not an option. Defendant Mitchell unholstered his Freeze +P spray, and again attempted to direct plaintiff to the back of his cell. Instead of complying, plaintiff stepped towards the cell door. Defendant Mitchell then sprayed plaintiff with a 3 to 5 second burst of Freeze +P, and ordered plaintiff to move to the back of his cell. Defendant Mitchell states that the first spray "did not appear to affect [plaintiff]," so he administered a second dose. Plaintiff entered an enraged state, and defendant Mitchell felt that entering the cell at this juncture would have likely resulted in injury for jail staff or plaintiff.

Defendant Mitchell continued to order plaintiff to the back of his cell. Plaintiff continued to ignore defendant Mitchell's orders, and eventually threw a five gallon bucket of an unknown liquid at defendant Mitchell. Defendant Mitchell was unable to fully avoid getting wet,

4

and told plaintiff once again to move to the back of his cell. Plaintiff responded by throwing a mug of coffee at him, and walking toward his cell door. Plaintiff then reached through the cell bars, and attempted to slap defendant Mitchell. Plaintiff missed, but was able to grab defendant Mitchell's shirt lapel. The lapel ripped as defendant Mitchell pulled away from plaintiff. Plaintiff called defendant Mitchell a "bitch" and told him to "open the doors and see what happens." Defendant Mitchell continued to give orders, which were ignored by plaintiff. Plaintiff was now in an "assaultive state," and defendant Mitchell unholstered his taser.

Words were once again exchanged between plaintiff and defendant Mitchell, and plaintiff was given one final warning that he would be tased if he failed to follow defendant Mitchell's orders. Because other inmates had become riled up, and for the safety of everyone involved, defendant Mitchell deployed the taser. Plaintiff fell to the ground and defendants Mitchell, Fruchey, and Touri breached his cell. Plaintiff was given an order to roll on his stomach and place his hands behind his back. Plaintiff ignored the order, and defendant Mitchell tased plaintiff for a second time. Defendant Mitchell asked plaintiff if he was done, and plaintiff responded in the affirmative. Plaintiff then complied with all orders and placed himself in the restraint chair. After plaintiff was properly restrained, defendant Fruchey removed the taser probes from plaintiff's body. Defendant Mitchell states that he does not remember seeing defendants Pingatore and Wagner at any time during the incident. Defendant Mitchell's affidavit is inconsistent with the other defendants' affidavits in several ways.

First, the chronological order of events that defendant Mitchell claims occurred is different from the one put forth by his fellow defendants. Defendant Mitchell claims he sprayed plaintiff twice in a row, and then the water and coffee were thrown at him. But defendants Fruchey,

Pingatore, and Touri claim that defendant Mitchell sprayed plaintiff, then plaintiff threw the bucket of water, defendant Mitchell responded by spraying plaintiff a second time, and then plaintiff threw the cup of coffee.

Second, defendant Mitchell states that he did not remember seeing defendant Pingatore at any time during the incident. While defendant Pingatore states that not only did he witness the events that occurred, but he also participated in breaching the cell door and entering the cell with defendant Mitchell. Third, defendants Fruchey, Pingatore, and Touri claim that the reason defendant Mitchell tapered plaintiff a second time was because plaintiff was attempting to remove the taser prongs from his stomach. However, defendant Mitchell simply states that plaintiff was refusing to comply with his verbal orders.

Defendant Mitchell states that the reason he tased plaintiff a second time was because, while on the ground, plaintiff failed to roll over and put his hands behind his back. Such an order would make sense if defendant Mitchell wanted to put plaintiff in handcuffs, because lines three and four of defendants Fruchey, Pingatore, and Touri's affidavits state that: "Labadie has a known history of violent and assaultive behavior in the Chippewa County Jail;" and "He is also a known fighter and is a large and intimidating individual." (Docket #26-3, 26-8, 26-11).

Moreover, defendant Mitchell repeatedly stated that plaintiff had threatened him with physical violence multiple times, and that just minutes earlier plaintiff was clenching his fist and pointing at defendant Mitchell, threatening to assault him if he opened the cell doors. Defendant Mitchell described plaintiff as being in an "enraged state" after being sprayed for a second time, and later, after ripping defendant Mitchell's uniform, plaintiff was described as being in an "assaultive state." The defendants have emphatically attested as to how dangerous plaintiff is; but when they

6

finally breached his cell, they failed to restrain him. Defendant Mitchell offers no explanation to justify tasing plaintiff a second time for failure to follow a command that clearly would lead to his handcuffing, and then failing to restrain him when plaintiff became compliant. One moment plaintiff posed a danger to jail staff and needed to be restrained, and the next moment plaintiff is no longer a threat to anyone. Plaintiff was allowed to walk out of his cell without being searched, without restraints, and all while in an enclosed space where he was in close proximity to jail staff.

The DVD adds some clarity to what occurred, but also contradicts portions of defendants' affidavits, and calls into question others. In reviewing the DVD, which has no audio, there is a mere 30 seconds lapse between the time defendant Mitchell enters the camera's frame, and the time he sprays plaintiff. Defendant Mitchell specifically describes five orders he gave plaintiff, and states that he also told plaintiff to sit on his bunk several times. Further, defendant Mitchell stated that plaintiff "unleashed a profanity-laced tirade" at him, and threatened him with physical violence numerous times during this half minute interval. That is a lot of dialogue to condense into a 30 second window. Another oddity is the location where defendant Mitchell is standing in the sally port. He stands right up against plaintiff's cell, appearing to be well within arm's reach of plaintiff. This is a strange posture for someone who is allegedly being threatened with physical violence by, as established above, a large, intimidating, and historically violent inmate. But even if defendant Mitchell's statements are correct, 30 seconds of arguing, no matter how vulgar, seems insufficient to justify the employment of Freeze +P on an inmate who is locked in a cell.

Defendant Mitchell claims that an escalation of force was necessary to avoid a riot, because plaintiff was riling up the other inmates. However, the DVD clearly shows an inmate laying down in the cell contiguous to plaintiff's cell. The inmate is showing no outward signs of aggression

7

or agitation, and does not appear to be interacting with plaintiff or any other inmate. Further, if the prison block was on the brink of rioting, surely some DVD must exist showing the good order and discipline of the BMU rapidly decaying. By providing one DVD, defense counsel has shown that he possesses the means necessary to provide this Court with such evidence. Surely counsel could proffer some evidence to show that prisoners were becoming agitated.

The DVD also solves the question of chronology. It shows defendant Mitchell spraying plaintiff with Freeze +P, then plaintiff throwing the bucket of water and the cup of coffee, then defendant Mitchell immediately spraying plaintiff a second time and walking away. This video evidence calls into question what exactly defendant Mitchell's intentions were by spraying plaintiff a second time. If one were to only look at Defendant Mitchell's affidavit, the second spraying appears justified, as defendant Mitchell states that the first spray had no effect on plaintiff. But this is clearly not what happened. After reviewing the video, a rational viewer could infer that defendant Mitchell's second use of the spray was more retaliatory than penological. To further evidence this inference, after defendant Mitchell sprayed plaintiff for a second time, he immediately turns away from plaintiff and walks away instead of trying to get plaintiff to comply with his order. It appears that there may be no discernable penological goal met by spraying an inmate in a cell, and then immediately walking away.

The DVD also reveals that only two officers accompany defendant Mitchell into plaintiff's cell; yet defendants Fruchey, Touri, and Pingatore all signed affidavits that say they entered the cell with him. Furthermore, defendant Mitchell stated that he has no recollection of seeing defendant Pingatore at any time during his altercation with plaintiff. The DVD shows the same two officers accompany defendant Mitchell throughout the event. A fourth officer does not

appear until the incident is already over, and plaintiff has been wheeled away. This officer may have been off camera witnessing events unfold, but at no time did he physically interact with plaintiff.

      Defendant Mitchell claims that plaintiff has failed to establish a valid Eighth Amendment excessive force claim. The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton infliction of pain are those that are "totally without penological justification." *Id.*

      Plaintiff's claim involving the use of force must be analyzed under the Supreme Court authority limiting the use of force against prisoners. This analysis must be made in the context of the constant admonitions by the Supreme Court regarding the deference that courts must accord to prison or jail officials as they attempt to maintain order and discipline within dangerous institutional settings. *See, e.g.*, *Whitley v. Albers*, 475 U.S. 312, at 321-22 (1986).

      Generally, restrictions and even harsh conditions of confinement are not necessarily cruel and unusual punishment prohibited by the Eighth Amendment. *Rhodes*, 452 U.S. 347. The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need

9

for application of force, the relationship between that need and the amount of force used, the threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Id.* (citing *Whitley*, 475 U.S. at 321); *accord McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990).

Defendant Mitchell's motion fails because there are material facts still in dispute. In particular, the evidence provided in support of defendant Mitchell's intent, when he used force against plaintiff, is not sufficient to warrant a judgment as a matter of law. Defendants Fruchey, Wagner, Pingatore, and Touri claim that they did not violate plaintiff's Eighth Amendment rights by failing to prevent defendant Mitchell from using excessive force against plaintiff.

In order to properly address this issue, it must first be determined if defendant Mitchell used excessive force. As stated above, that issue is still in contention and survives the instant motion for summary judgment. Furthermore, it is still unclear who exactly was with defendant Mitchell when force was employed. These material facts are still in dispute; and, therefore, defendants Fruchey, Pingatore, and Touri's motion for summary judgment should be denied.

Defendant Wagner was not involved in the events that occurred at plaintiff's cell. Defendant Wagner merely summoned defendant Mitchell to the BMU. After that, she did not participate with or authorize defendant Mitchell's actions. It is well established that a party cannot be held liable under § 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982). *See also Bellamy*

*v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).  Therefore, the claims against defendant Wagner should be dismissed with prejudice.

For the foregoing reasons, I recommend that defendants Mitchell, Wagner, Fruchey, Pingatore, and Touri's motion for summary judgment (Docket #26) be denied in part, and granted in part.  As to defendants Mitchell, Fruchey, Pingatore, and Touri, their motions for summary judgment should be denied.  As to defendant Wagner, her motion for summary should be granted.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the undersigned recommends granting in part, and denying in part, defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal.  Should the court adopt the report and recommendation and should plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

Dated: July 7, 2015                    /s/ Timothy P. Greeley
                                       TIMOTHY P. GREELEY
                                       UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).