UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

---

KIRK WAYNE LABADIE,

    Plaintiff,

v.                                                                                         Case No. 2:14-cv-23
                                                                HON. ROBERT HOLMES BELL

DOUGLAS MITCHELL, et al.,

    Defendants.
_____/

REPORT AND RECOMMENDATION

        Plaintiff Kirk Wayne Labadie filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against the remaining defendants Douglas Mitchell, Justin Frunchey, Frank Pingatore, and Matthew Touri asserting allegations of excessive force while he was confined in the Chippewa County Jail. At the time of the incident, Defendants' assert that Plaintiff was a pretrial detainee.[1] Plaintiff has filed a Motion For Summary Judgment (ECF No. 49) and Defendants have filed a motion to strike Plaintiff's Motion For Summary Judgment (ECF No. 52). In concluding that a genuine issue of material fact exists regarding whether excessive force was used against Plaintiff, the Court set forth the facts of this case as follows:

> On August 19, 2012, an agitated prisoner, Kenneth Kammerse, clogged his toilet, causing flooding in the Behavioral Management Unit ("BMU") of the Chippewa County Jail. Defendant Mitchell started a dialogue with Kammerse and had almost pacified the prisoner when plaintiff, yelling from his cell, interjected into their

---

[1] While this case was on appeal, Defendants filed a motion in the Sixth Circuit for judicial notice of documents confirming that Plaintiff was a pretrial detainee when the events occurred. Plaintiff is now incarcerated within the MDOC at the Oaks Correctional Facility.

conversation. Plaintiff claims that he was unaware that defendant Mitchell was talking to Kammerse, but the damage had been done, and Kammerse once again became irate. Defendant Mitchell, abandoning his attempts to placate Kammerse, then approached plaintiff. From here, it is unclear as to what exactly occurred.

Plaintiff offers a different version of events than defendants, and supplies no medical documentation or statements from witnesses to corroborate his testimony. Each defendant, on the other hand, has filed an affidavit with the Court, and defendants have submitted a DVD that shows their interaction with plaintiff. However, defendants' affidavits contradict one another, and assert fact patterns that are incompatible with what is shown on the DVD.

Plaintiff's version of events are as follows. Defendant Mitchell approached plaintiff's cell and told plaintiff to "Shut the fuck up and sit your ass down." Defendants Fruchey, Pingatore, and Touri were near plaintiff's cell at this time, and were observing plaintiff's interaction with defendant Mitchell. When plaintiff refused to sit down and remain silent, defendant Mitchell spat at him and again said "Shut the fuck up and sit down." Plaintiff refused to acquiesce, and defendant Mitchell sprayed him with Frost +P and laughed at plaintiff. Plaintiff then grabbed a bucket of water and threw it at defendant Mitchell. Defendant Mitchell then motioned as if he was going to spray plaintiff again, but before he could, plaintiff reached outside the bars and grabbed defendant Mitchell's shirt, temporarily preventing him from employing the Frost +P. When defendant Mitchell eventually escaped plaintiff's grasp, he sprayed plaintiff for a second time. Plaintiff responded by throwing a cup of lukewarm coffee onto defendant Mitchell, who then left for approximately five minutes.

When defendant Mitchell returned with a restraint chair, he told plaintiff to place his hands against the wall. Plaintiff replied, "Fuck off." Defendant Mitchell then employed a taser on plaintiff, as plaintiff was falling to the floor. Defendant Mitchell asked plaintiff how he liked being tased, and if he was done. Plaintiff said he was done, and was directed by defendant Mitchell to rise. When plaintiff attempted to get up, defendant Mitchell tased him again. Plaintiff was then allowed to get up off the floor and walk by himself to the restraint chair. No party contests that after the second tasing, plaintiff walked by himself to the restraint chair without incident. Plaintiff was then properly restrained and left in an observation cell for approximately two hours, where prison staff checked on him every fifteen minutes.

Defendant Mitchell states in his affidavit that he approached plaintiff's cell and told him to quiet down, as he was trying to pacify inmate Kammerse. Plaintiff responded with a profanity laced tirade, and after defendant Mitchell ordered him to sit down a second time, plaintiff asked "Who the fuck do you think you are?" When defendant Mitchell identified himself, plaintiff threatened defendant Mitchell with physical violence "numerous times," and stated that he would beat defendant Mitchell's "punk ass." (Docket# 26-2, 3). At this point, defendant Mitchell feared the situation was quickly building towards a riot in the BMU. Defendant Mitchell ordered plaintiff to sit down several times, but plaintiff continued to ignore defendant Mitchell's commands and continued to make threats. This altercation was inciting prisoners to become more vocal and upset.

Defendant Mitchell, after repeated unsuccessful attempts at quieting plaintiff, ordered plaintiff to place his hands on the back wall of the cell, so that jail staff could safely enter the cell and get control of him. Plaintiff again refused. Because the BMU houses violent and aggressive inmates, entering plaintiff's cell without first incapacitating him was not an option. Defendant Mitchell unholstered his Freeze +P spray, and again attempted to direct plaintiff to the back of his cell. Instead of complying, plaintiff stepped towards the cell door. Defendant Mitchell then sprayed plaintiff with a 3 to 5 second burst of Freeze +P, and ordered plaintiff to move to the back of his cell. Defendant Mitchell states that the first spray "did not appear to affect [plaintiff]," so he administered a second dose. Plaintiff entered an enraged state, and defendant Mitchell felt that entering the cell at this juncture would have likely resulted in injury for jail staff or plaintiff.

Defendant Mitchell continued to order plaintiff to the back of his cell. Plaintiff continued to ignore defendant Mitchell's orders, and eventually threw a five gallon bucket of an unknown liquid at defendant Mitchell. Defendant Mitchell was unable to fully avoid getting wet, and told plaintiff once again to move to the back of his cell. Plaintiff responded by throwing a mug of coffee at him, and walking toward his cell door. Plaintiff then reached through the cell bars, and attempted to slap defendant Mitchell. Plaintiff missed, but was able to grab defendant Mitchell's shirt lapel. The lapel ripped as defendant Mitchell pulled away from plaintiff. Plaintiff called defendant Mitchell a "bitch" and told him to "open the doors and see what happens." Defendant Mitchell continued to give orders, which were ignored by plaintiff. Plaintiff was now in an "assaultive state," and defendant Mitchell unholstered his taser.

- 3 -

Words were once again exchanged between plaintiff and defendant Mitchell, and plaintiff was given one final warning that he would be tased if he failed to follow defendant Mitchell's orders. Because other inmates had become riled up, and for the safety of everyone involved, defendant Mitchell deployed the taser. Plaintiff fell to the ground and defendants Mitchell, Fruchey, and Touri breached his cell. Plaintiff was given an order to roll on his stomach and place his hands behind his back. Plaintiff ignored the order, and defendant Mitchell tased plaintiff for a second time. Defendant Mitchell asked plaintiff if he was done, and plaintiff responded in the affirmative. Plaintiff then complied with all orders and placed himself in the restraint chair. After plaintiff was properly restrained, defendant Fruchey removed the taser probes from plaintiff's body. Defendant Mitchell states that he does not remember seeing defendants Pingatore and Wagner at any time during the incident. Defendant Mitchell's affidavit is inconsistent with the other defendants' affidavits in several ways.

First, the chronological order of events that defendant Mitchell claims occurred is different from the one put forth by his fellow defendants. Defendant Mitchell claims he sprayed plaintiff twice in a row, and then the water and coffee were thrown at him. But defendants Fruchey, Pingatore, and Touri claim that defendant Mitchell sprayed plaintiff, then plaintiff threw the bucket of water, defendant Mitchell responded by spraying plaintiff a second time, and then plaintiff threw the cup of coffee.

Second, defendant Mitchell states that he did not remember seeing defendant Pingatore at any time during the incident. While defendant Pingatore states that not only did he witness the events that occurred, but he also participated in breaching the cell door and entering the cell with defendant Mitchell. Third, defendants Fruchey, Pingatore, and Touri claim that the reason defendant Mitchell tasered plaintiff a second time was because plaintiff was attempting to remove the taser prongs from his stomach. However, defendant Mitchell simply states that plaintiff was refusing to comply with his verbal orders.

Defendant Mitchell states that the reason he tased plaintiff a second time was because, while on the ground, plaintiff failed to roll over and put his hands behind his back. Such an order would make sense if defendant Mitchell wanted to put plaintiff in handcuffs, because lines three and four of defendants Fruchey, Pingatore, and Touri's affidavits state that: "Labadie has a known history of violent and assaultive behavior in the Chippewa County Jail;" and "He is also a

- 4 -

known fighter and is a large and intimidating individual." (Docket #26-3, 26-8, 26-11).

Moreover, defendant Mitchell repeatedly stated that plaintiff had threatened him with physical violence multiple times, and that just minutes earlier plaintiff was clenching his fist and pointing at defendant Mitchell, threatening to assault him if he opened the cell doors. Defendant Mitchell described plaintiff as being in an "enraged state" after being sprayed for a second time, and later, after ripping defendant Mitchell's uniform, plaintiff was described as being in an "assaultive state." The defendants have emphatically attested as to how dangerous plaintiff is; but when they finally breached his cell, they failed to restrain him. Defendant Mitchell offers no explanation to justify tasing plaintiff a second time for failure to follow a command that clearly would lead to his handcuffing, and then failing to restrain him when plaintiff became compliant. One moment plaintiff posed a danger to jail staff and needed to be restrained, and the next moment plaintiff is no longer a threat to anyone. Plaintiff was allowed to walk out of his cell without being searched, without restraints, and all while in an enclosed space where he was in close proximity to jail staff.

The DVD adds some clarity to what occurred, but also contradicts portions of defendants' affidavits, and calls into question others. In reviewing the DVD, which has no audio, there is a mere 30 seconds lapse between the time defendant Mitchell enters the camera's frame, and the time he sprays plaintiff. Defendant Mitchell specifically describes five orders he gave plaintiff, and states that he also told plaintiff to sit on his bunk several times. Further, defendant Mitchell stated that plaintiff "unleashed a profanity-laced tirade" at him, and threatened him with physical violence numerous times during this half minute interval. That is a lot of dialogue to condense into a 30 second window. Another oddity is the location where defendant Mitchell is standing in the sally port. He stands right up against plaintiff's cell, appearing to be well within arm's reach of plaintiff. This is a strange posture for someone who is allegedly being threatened with physical violence by, as established above, a large, intimidating, and historically violent inmate. But even if defendant Mitchell's statements are correct, 30 seconds of arguing, no matter how vulgar, seems insufficient to justify the employment of Freeze +P on an inmate who is locked in a cell.

Defendant Mitchell claims that an escalation of force was necessary to avoid a riot, because plaintiff was riling up the other inmates. However, the DVD clearly shows an inmate laying down in the cell

contiguous to plaintiff's cell. The inmate is showing no outward signs of aggression or agitation, and does not appear to be interacting with plaintiff or any other inmate. Further, if the prison block was on the brink of rioting, surely some DVD must exist showing the good order and discipline of the BMU rapidly decaying. By providing one DVD, defense counsel has shown that he possesses the means necessary to provide this Court with such evidence. Surely counsel could proffer some evidence to show that prisoners were becoming agitated.

The DVD also solves the question of chronology. It shows defendant Mitchell spraying plaintiff with Freeze +P, then plaintiff throwing the bucket of water and the cup of coffee, then defendant Mitchell immediately spraying plaintiff a second time and walking away. This video evidence calls into question what exactly defendant Mitchell's intentions were by spraying plaintiff a second time. If one were to only look at Defendant Mitchell's affidavit, the second spraying appears justified, as defendant Mitchell states that the first spray had no effect on plaintiff. But this is clearly not what happened. After reviewing the video, a rational viewer could infer that defendant Mitchell's second use of the spray was more retaliatory than penological. To further evidence this inference, after defendant Mitchell sprayed plaintiff for a second time, he immediately turns away from plaintiff and walks away instead of trying to get plaintiff to comply with his order. It appears that there may be no discernable penological goal met by spraying an inmate in a cell, and then immediately walking away.

The DVD also reveals that only two officers accompany defendant Mitchell into plaintiff's cell; yet defendants Fruchey, Touri, and Pingatore all signed affidavits that say they entered the cell with him. Furthermore, defendant Mitchell stated that he has no recollection of seeing defendant Pingatore at any time during his altercation with plaintiff. The DVD shows the same two officers accompany defendant Mitchell throughout the event. A fourth officer does not appear until the incident is already over, and plaintiff has been wheeled away. This officer may have been off camera witnessing events unfold, but at no time did he physically interact with plaintiff.

Report and Recommendation, ECF No. 35, PageID.179-186. The Report and Recommendation was approved and adopted as the opinion of the Court on August 17, 2015. ECF No. 37, PageID.196. Defendants appealed to the Sixth Circuit. The Sixth Circuit dismissed the appeal finding that there

were genuine issues of material fact precluding summary judgment. ECF No. 44. Based upon these findings, Plaintiff asserts that he is entitled to summary judgment on his claims.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

In *Kingsley v. Hendrickson*, 576 U.S. ___, 135 S.Ct. 2466, 2015 WL 2473382 (June 22, 2015), the Supreme Court held that the use of excessive force on pretrial detainees is measured under the Due Process Clause of the Fourteenth Amendment. The Court rejected a subjective

standard, holding that the relevant inquiry is whether the force purposely or knowingly used against the prisoner was objectively unreasonable, *cited in Coley v. Lucas Cnty.*, 799 F.3d 530 (6th Cir. 2015).

> "Excessive force claims can be resolved under the Fourth, Eighth and Fourteenth Amendments – the applicable amendment depends on the plaintiff's status at the time of the incident: a free citizen in the process of being arrested or seized; a convicted prisoner; or someone in "gray area[s]" around the two. *Burgess*, 735 F.3d at 472; *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). When a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, we perform a Fourth Amendment inquiry into what was objectively "reasonable" under the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008). These Fourth Amendment protections extend through police booking until the completion of a probable cause hearing. *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010). When convicted prisoners bring claims of excessive force, we turn to the Eighth Amendment, which forbids the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment," and specifically conduct that is malicious and sadistic. *Hudson v. McMillian*, 503 U.S. 1, 5, 7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *United States v. Budd*, 496 F.3d 517, 531- 32 (6th Cir. 2007). To violate the Fourteenth Amendment rights of free citizens not subject to search or seizure, the conduct of law enforcement officials must "shock[] the conscience," whether it be "malicious and sadistic" behavior in the context of a "fluid" and "dangerous" situation, or "deliberate indifference" when there is "reasonable opportunity to deliberate" before taking action. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (internal quotation marks omitted); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-53 (1998).
>
> Until very recently, it was unclear which standard applied to excessive force claims brought by pretrial detainees. The Supreme Court has recently clarified, however, that when assessing pretrial detainees' excessive force claims we must inquire into whether the plaintiff shows "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The inquiry is highly fact-dependent, and must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* It should also account for "the 'legitimate

interests that stem from [the government's] need to manage the facility in which the individual is detained,'" *id.*, and defer when appropriate to "'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)). The Court further instructs:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

> *Id.* This list is not exclusive. Kingsley also reaffirms that pretrial detainees cannot be subjected to "the use of excessive force that amounts to punishment," *id.* (quoting *Graham*, 490 U.S. at 395 n.10) precisely because they "cannot be punished at all," *id.* at 2475."

*Id.* at 537-538. Applying these standards, in the opinion of the undersigned, it is clear that a question of fact exists whether the force used by Defendants exceeded constitutional standards. The Sixth Circuit Court of Appeals stated:

> As discussed by the magistrate judge, and unobjected to by the defendants, material facts are in dispute regarding whether Mitchell "used excessive force" and who of the remaining defendants were present with Mitchell during the incident. At minimum, though, accepting Labadie's version of the facts that he was tased a second time while attempting to comply with Mitchell's order to get off the floor and get in a restraint chair, the second tasering could constitute excessive use of force. *See Goodwin*, 781 F.3d at 327-28; *Austin*, 690 F.3d at 496-97; *Kijowski*, 372 F. App'x at 599-601; *Roberts*, 240 F. Appp'x at 677-78. Furthermore, accepting Labadie's factual recitation that Fruchey, Pingatore, and Touri were present during the incident, a jury could find that those defendants could have seen the excessive use of force and prevented it. *See Goodwin*, 781 F.3d at 328-29 (holding that officers were not entitled to qualified immunity as to arrestee's failure-to-protect claim where arrestee presented evidence that officers were present and involved in excessive force incident).

- 9 -

Order, dated May 25, 2016, United States Court of Appeals For the Sixth Circuit, ECF No. 44, at 4. Plaintiff has not presented any additional factual evidence to support his claim that excessive force was used against him. Plaintiff relies on the evidence of record, the decision of this Court, and the Sixth Circuit Court of Appeals' decision. As both this Court and the Sixth Circuit Court of Appeals have held, a question of fact exists as to whether Plaintiff's rights were violated. In the opinion of the undersigned, Plaintiff is not entitled to summary judgment and this case should proceed to trial.

Accordingly, it is recommended that Plaintiff's motion for summary judgment (ECF No. 49) be denied and Defendants' motion to strike Plaintiff's summary judgment motion (ECF No. 52) be denied as moot.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: August 3, 2016

                                                */s/ Timothy P. Greeley*
                                                TIMOTHY P. GREELEY
                                                UNITED STATES MAGISTRATE JUDGE