UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIRK LABADIE,

        Plaintiff,

                                        File No. 2:14-cv-23

v.

                                        HON. ROBERT HOLMES BELL

DOUGLAS MITCHELL, et al.,

        Defendants.

_____/

## **OPINION**

This is a civil rights action brought by state prisoner, Plaintiff Kirk Labadie, against Defendants Douglas Mitchell, Justin Fruchey, Frank Pingatore, and Matthew Touri, under 42 U.S.C. § 1983.  The matter came before the Court for a bench trial on January 17, 2017.  The Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## I.    BACKGROUND

Plaintiff Labadie brought an action under § 1983 alleging excessive force against Defendant Mitchell and failure-to-intervene claims against Defendants Fruchey, Pingatore, and Touri, in violation of the Fourteenth Amendment.  On August 8, 2014, Plaintiff filed an amended complaint. (ECF No. 12.)  On February 29, 2015, Defendants moved for summary judgment. (ECF No. 26.)  The Court dismissed Defendant Wagner and denied summary judgment for the remaining Defendants. (ECF No. 37.)  Plaintiff also moved for summary judgment (ECF No. 49) on July 7, 2016, which the Court denied (ECF No. 61).

On January 6, 2017, the parties held a settlement conference and final pre-trial conference before Magistrate Judge Ray Kent.  In preparation for trial, Defendants filed their proposed findings of fact (ECF No. 83), a trial brief (ECF No. 93), a joint statement of the case (ECF No. 94), proposed jury instructions (ECF No. 95), a proposed verdict form (ECF No. 96), and a joint exhibit book (ECF Nos. 98, 99).  Plaintiff filed his proposed findings of fact (ECF No. 88) and requested that the clerk file his proposed findings of fact as his trial brief (ECF No. 92).

The bench trial took place on January 17, 2017.  The Court heard testimony from Plaintiff Labadie, Defendant Mitchell, Defendant Fruchey, Defendant Pingatore, and Defendant Touri.  The Court also received as exhibits a surveillance video from the jail (Def.'s Ex. C), as well as photos taken of Defendant Mitchell (Def.'s Ex. H) and Plaintiff (Def.'s Ex. I) after the incident.  Before trial began, the Court denied Plaintiff's motion to appoint counsel (ECF No. 97).

## II.    FINDINGS OF FACT

On August 19, 2012, Defendant Mitchell arrived at the Chippewa County Jail to assist with an out-of-control inmate.  Defendant Mitchell responded to the Behavioral Management Unit ("BMU") of the jail, which houses assaultive inmates with behavioral issues.  By the time Defendant Mitchell arrived, inmate Kammers had flooded his cell with toilet water. The water had already exited Kammers' cell and made its way toward other cells in the BMU. During this time, inmate Kammers was agitated and irate; he was yelling and throwing things in and out of his cell.  Defendant Mitchell approached inmate Kammers in an attempt to calm

him down while Defendants Fruchey, Pingatore, and Touri cleaned up the excess water.  At the same time, Plaintiff yelled to Kammers, also in an attempt to calm him down.  As Defendant Mitchell spoke with Kammers, Plaintiff yelled so loudly that Defendant Mitchell could not hear himself talk.  Defendant Mitchell walked to Plaintiff's cell, A7.  In response, Plaintiff stood up and approached Defendant Mitchell.  Defendant Mitchell testified that he felt threatened and thought that Plaintiff was a threat to the safety and security of the facility. Defendant Mitchell gave Plaintiff direct, verbal orders to sit down and stop yelling.  Plaintiff refused and began to swear at Defendant Mitchell.  Plaintiff also threatened Defendant Mitchell twice.  During the exchange, Plaintiff's face was red, and he clenched his fists and raised his arm towards Defendant Mitchell.  This lasted for approximately 30 seconds.

During trial, Plaintiff admitted that he refused to comply with Defendant Mitchell's orders.  He testified that, in response, Defendant Mitchell placed his chin on the bars of the cell door and spat at him.  It is unclear from the video whether this in fact happened. Defendant Mitchell continued to give Plaintiff loud, verbal commands to retreat to the back of his cell and to put his hands on the wall.  He informed Plaintiff that he would be maced if he did not cooperate.  Again, Plaintiff refused to comply, so Defendant Mitchell sprayed Plaintiff with Freeze+P spray, a form of mace.  It did not appear to have any effect on Plaintiff.  Then, Plaintiff threw approximately 5 gallons of liquid at Defendant Mitchell, which soaked Defendant Mitchell.  Defendant again told Plaintiff to go to the back of his cell and to put his hands on the wall, but Plaintiff refused.  Instead, Plaintiff threw a mug of lukewarm coffee at Defendant Mitchell.  Defendant Mitchell continued to order Plaintiff to

the back of his cell and to put his hands on the wall or he would be maced again.  Plaintiff still did not comply, so Defendant Mitchell sprayed the mace once more.  Plaintiff then retreated to the back of his cell to wash his face with water.

After the second spray, Defendant Mitchell left Plaintiff's cell to check on inmate Kammers while Defendant Touri retrieved a restraint chair.  Plaintiff continued to yell after Defendant Mitchell left his cell.  Two minutes later, Defendant Mitchell returned to Plaintiff's cell and once again, ordered him to go to the back of his cell.  Defendant Mitchell's goal was to get Plaintiff in a safe and secure position for entry into the cell. Defendant Mitchell did not want to go hands-on with Plaintiff because Plaintiff had already made several threats to Defendant Mitchell during their exchange.  Defendant Mitchell gave several loud, verbal commands, and warned Plaintiff that if he did not comply, he would be tased.  Defendant Mitchell did not yell TASER, TASER, TASER, but he warned Plaintiff several times before using his taser.

At one point, Plaintiff reached through the cell bars and attempted to slap Defendant Mitchell.  He missed, but grabbed Defendant Mitchell's right shoulder lapel and tore it.  In response to Plaintiff's assaultive behavior, Defendant Mitchell used the probe application of his taser on Plaintiff.  When Defendant Mitchell pulled the trigger, two probes fired and landed on Plaintiff's left abdomen and left leg.  This activated the taser for 5 seconds, and Plaintiff regained control over his body after that time.  During this time, Defendants Touri and Fruchey arrived with the restraint chair.  Then, the three officers entered Plaintiff's cell. Defendant Mitchell continued to give loud, verbal commands but Plaintiff did not comply.

4

Rather, he attempted to rip out his taser probes.  Defendant Mitchell warned Plaintiff that he would be tased again if he did not roll over onto his stomach and place his hands behind his head.  Plaintiff continued to actively resist, and Defendant Mitchell used his taser again. Defendant Mitchell asked Plaintiff if he was done resisting commands, and Plaintiff said that he was finished.  Then, Plaintiff stood up, with the taser probes still attached to his body, and walked to the restraint chair.  Plaintiff did not limp or ask for medical attention as he walked to the restraint chair.  Defendant Fruchey and Defendant Touri strapped Plaintiff into the restraint chair.  Once restrained, Plaintiff began to threaten Defendant Mitchell again. During the entire exchange, Defendant Pingatore was at the control box, about 50-100 feet away from the incident.  He did not observe Defendant Mitchell's use of the mace or taser, but did see fluids come out of the cell.  He could hear yelling, but could not understand what was being said because it was so loud in jail.

In addition, Defendant Mitchell knew of Plaintiff, but had never met him before August 19, 2012.  Defendant Pingatore also testified that Plaintiff was known to be a dangerous, unpredictable inmate.  Because of Plaintiff's disruptive behavior, Defendant Mitchell believed that the BMU was on the verge of a riot.  Yet he admitted that the inmate in the adjacent cell appeared calm during the exchange.   He also explained that the jail preserved the surveillance video in preparation for a criminal trial.  The jail saves video surveillance on a hard drive for 15-30 days before it is taped over.  Therefore, Defendants could not produce additional videos to show what happened in other parts of the BMU that day.

5

Further, Defendant Mitchell explained that he could not just walk away or let Plaintiff remain in his cell. Once Plaintiff became disruptive and assaultive, jail policy required Plaintiff to be placed in a restraint chair and removed from his cell. Defendants Fruchey, Touri, and Pingatore testified that Defendant Mitchell acted appropriately, in accordance with the Chippewa County Sheriff's Office taser policy and procedure, as well as its inmate rules, discipline, grievance, and rights policy.

Plaintiff testified that his ankle was injured when Defendant Mitchell tased him. He also complained of skin irritation and mental duress. Plaintiff testified that he was fearful of electricity and electrical appliances, switches, and sockets. He admitted that he had anxiety prior to August 19, 2012, but it has gotten worse. Plaintiff further testified that he is presently serving a sentence for assault with intent to do great bodily harm less than murder, as well as time for two felony assaults on prison guards that occurred one month before the incident at issue.

## III.   CONCLUSIONS OF LAW

Government officials acting in their official capacity are entitled to qualified immunity for discretionary acts that do not violate clearly-established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has applied a three-step test to determine whether qualified immunity applies. *Gray v. City of Detroit*, 399 F.3d 612, 615 (6th Cir. 2005) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900-901 (6th Cir. 2004)). First, the Court must determine whether a violation of Plaintiff's constitutional rights has occurred.

*Id.* Second, the Court asks if the violation "involved a clearly established constitutional right of which a reasonable person would have known." *Id.* Third, the Court determines if Plaintiff has shown that the official's conduct was objectively unreasonable in light of the clearly established constitutional right at issue. *Id.* "A negative answer to any of the three questions means that the officer is entitled to qualified immunity." *Id.*

Because Defendants have raised qualified immunity as a defense to § 1983 liability, Plaintiff bears the burden of demonstrating that they are not entitled to qualified immunity. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006)). Plaintiff also has the burden of showing that a right is clearly established. *Id.* (citing *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004)). But Defendants carry the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time. *Id.* (citing *Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004)).

The Due Process Clause of the Fourteenth Amendment provides protections to pre-trial detainees against excessive force. *Graham v. Connor*, 490 U.S. 386, 394-95 n.10 (1989). Plaintiff must show that the force purposely or knowingly used against him was objectively unreasonable in order to demonstrate that it was excessive in violation of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). The Court cannot apply this standard mechanically. *Id.* "Rather, objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

The Court must make this determination "from the perspective of a reasonable officer

7

on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* The Court must "also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pre-trial detainees." *Bell*, 441 U.S. at 546. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.* at 546-47. Therefore, "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." *Id.*

Further, the "calculus of reasonableness must embody allowance for the fact that officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The following considerations may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396). This list

8

is not exhaustive; the Court may consider other relevant factors as well. But pre-trial detainees cannot be subjected to "the use of excessive force that amounts to punishment." *Id.* (citing *Graham*, 490 U.S. at 395 n.10).

Moreover, an officer may be held liable for failure to intervene during the application of excessive force when: "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *see also Goodwin v. City of Painesville*, 781 F.3d 314, 328-29 (6th Cir. 2015) (holding that officers were not entitled to qualified immunity as to arrestee's failure-to-protect claim where arrestee presented evidence that officers were present and involved in excessive-force incident).

### A. Excessive Force Claims Against Defendant Mitchell

First, the Court must determine whether the force purposely or knowingly used against Plaintiff was objectively unreasonable. The Court must make this determination from the perspective of a reasonable officer on the scene, including what Defendant Mitchell knew at the time and accounting for the legitimate interests stemming from the need to manage the facility to preserve internal order, discipline, and institutional security. When Defendant Mitchell arrived at the jail to assist with an out-of-control inmate in the BMU, he knew that he was walking into a potentially volatile situation. Defendant Mitchell also knew, from his prior experience working in the jail, that the BMU housed assaultive inmates with behavioral issues. Defendant Mitchell perceived that Plaintiff's disruptive behavior increased tension

9

in the BMU to the point that he feared that Plaintiff would incite a riot in the jail. Defendant Mitchell also received verbal threats from Plaintiff while Plaintiff's face was red, his fists clenched, and his arm raised towards Defendant Mitchell. Even though Plaintiff was secured in his cell, a reasonable officer in Defendant Mitchell's shoes would have felt threatened by Plaintiff and would have been concerned about the safety and security of the facility.

Further, Defendant Mitchell testified that, once Plaintiff became assaultive, jail policy required Plaintiff's removal from his cell. The Court must defer to the jail's policies and practices that are necessary to preserve internal order, discipline, and institutional security. Although Plaintiff argued that Defendant Mitchell could have walked away from the situation and left Plaintiff in his cell, under jail policy, that was not an option. Plaintiff needed to be removed from his cell and placed in a restraint chair. Given that fact, Defendant Mitchell reasonably determined that it would not be safe for himself, Plaintiff, or other officers to go hands-on with Plaintiff to remove him from the cell. He reasonably assessed the situation to determine that some level of force would be necessary. Further, the other officers involved testified that Defendant Mitchell followed the jail's use of force policies.

Defendant Mitchell gave several verbal orders to Plaintiff, which Plaintiff refused to follow. First, Defendant Mitchell attempted to use mace, a lesser method of force. He used mace for a second time only after the first spray appeared to have no effect and Plaintiff threw the 5-gallon bucket of liquid and a coffee mug at Defendant Mitchell. At this point, a reasonable officer would have used pepper spray a second time. Defendant Mitchell's use of force was not retaliatory or to punish Plaintiff. Nor was it used "maliciously and

10

sadistically for the very purpose of causing harm." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). Rather, its purpose was to get Plaintiff to a state that would make removal safe for all involved, including Plaintiff, and to restore discipline in the jail. *Id.* In addition, the threat of a riot occurring at the jail was a severe security problem. Given Defendants' testimony, the video, and Plaintiff's admission that he was yelling and refusing to obey commands, Defendant Mitchell reasonably perceived this threat. Further, Plaintiff's continued active resistance supports a finding of reasonableness. Thus, Defendant Mitchell's use of mace was objectively reasonable.

As such, Plaintiff has failed to satisfy his burden of showing a constitutional violation. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (interpreting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994), to hold that the use of force after a suspect has been "incapacitated by mace would be excessive as a matter of law"); *see also Champion*, 380 F.3d at 901 (officers used excessive force by dousing suspect with pepper spray after he was immobilized with handcuffs and leg shackles and stopped resisting). Defendant Mitchell did not continue to use mace after Plaintiff was incapacitated. In fact, after the first spray, Plaintiff continued to actively resist commands and engage in assaultive behavior towards Defendant Mitchell; he was not incapacitated. Plaintiff has failed to show a constitutional violation, the first step required to refute a defense of qualified immunity. Therefore, Plaintiff has failed to show that Defendant Mitchell is not entitled to qualified immunity for his use of mace.

Likewise, given Plaintiff's continued assaultive state and refusal to comply with orders, Defendant Mitchell reasonably employed an increased amount of force. Prior to that,

Plaintiff had already reached an assaultive state by throwing multiple liquids at Defendant Mitchell.  Further, he continued this disruptive behavior even after Defendant Mitchell left the area.  Upon Defendant Mitchell's return, Plaintiff attempted to slap Defendant Mitchell through the cell bars and tore the lapel off of Defendant Mitchell's uniform.  Given Plaintiff's increasingly assaultive behavior and continued refusal to comply with verbal commands, Defendant Mitchell's taser use was objectively reasonable.  This is particularly true in light of the fact that the first use of mace did not affect Plaintiff and the second use led to Plaintiff's increased aggression.

Accounting for the legitimate interests stemming from the need to manage the facility, to preserve internal order and discipline, and to maintain institutional security, Defendant Mitchell behaved objectively reasonably under the circumstances.  There was a strong relationship between the need for the use of force and the amount of force actually used by Defendant Mitchell.  *See, e.g.*, *Hagans v. Frankling Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012) (noting that "no case in any circuit [has] held that officers used excessive force by tasing suspects who were actively resisting . . . even though many of them . . . were suspected of innocuous crimes, posed little risk of escape and had not yet physically harmed anybody").  In addition, the threat of a riot occurring at the jail was a severe security problem.  Given Defendants' testimony, the video, and Plaintiff's admission that he was yelling and refusing to obey commands, Defendant Mitchell reasonably perceived this threat.  Although the inmate adjacent to Plaintiff's cell appeared calm in the video, Defendants testified that Plaintiff was disruptive and riled up during his interaction with Defendant

12

Mitchell.  During the exchange, Plaintiff actively resisted, refused to obey commands, and became increasingly more assaultive.  Therefore, these *Graham* factors support a finding of reasonable force.

Again, Plaintiff has failed to show a constitutional violation as to Defendant Mitchell's taser use.  Indeed, "[g]ratuitous violence inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial." *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009).  But the video shows that Plaintiff was never incapacitated.  Rather, he repeatedly refused to comply with Defendant Mitchell's verbal commands.  Given Plaintiff's active resistance and increasingly assaultive behavior, Defendant Mitchell did not engage in gratuitous violence.  Defendant Mitchell did not violate Plaintiff's constitutional rights; thus, Plaintiff has failed to show that Defendant Mitchell is not entitled to qualified immunity.  Defendant Mitchell acted objectively reasonably under the circumstances and he is entitled to qualified immunity.  Accordingly, Plaintiff's claims against Defendant Mitchell are barred by qualified immunity.

**B. Failure-to-Intervene Claims Against Defendants Fruchey, Pingatore, and Touri**

First, Plaintiff's failure-to-intervene claims fail because Plaintiff did not establish that Defendant Mitchell used excessive force.  An officer "may be held liable to failure to intervene during the application of excessive force when: '(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Goodwin*, 781 F.3d at

13

328 (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  Because Plaintiff has not established excessive use of force, Plaintiff has not satisfied either prong of this test.  Thus, Defendants Fruchey, Pingatore, and Touri are entitled to qualified immunity, and Plaintiff's failure-to-intervene claims are barred.

Moreover, Defendant Pingatore testified that he was in the control box and had no involvement with the incident.  He could not hear the exchange between Plaintiff and Defendant Mitchell nor could he see Defendant Mitchell's actions.  Plaintiff has not shown that Defendant Pingatore observed or had reason to know that Defendant Mitchell used excessive force.  Further, he has not shown that Defendant Pingatore had both the opportunity and the means to prevent the harm from occurring.

## IV.    CONCLUSION

In conclusion, Defendants Mitchell, Fruchey, Pingatore, and Touri did not violate Plaintiff's constitutional rights.  Because Plaintiff has failed to show that Defendants are not entitled to qualified immunity, the Court will enter judgment for Defendants.  An order and judgment will enter in accordance with this opinion.


Dated: January 23, 2017                          /s/ Robert Holmes Bell
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE

14